**ORIGINAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**08 CRIM.**          **712**

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,

      - v. -

DAVID COPELAND REED,

           Defendant.

:
:
:
:
:
:
:
:
:
:
:
:

**TO BE FILED UNDER SEAL**
**INDICTMENT**

08 Cr. _____

*JUDGE KOELTL*

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY
DOC #:
DATE FILED:

**COUNT ONE**

(Money Laundering Conspiracy)

The Grand Jury charges:

**Relevant Persons and Entities**

1.  At all times relevant to this Indictment, DAVID
COPELAND REED, the defendant, was the founder and the controlling
officer of OSGold, OSOpps, and ECommerce Exchange, Inc.
("ECommerce Exchange"), and controlled various bank accounts and
entities as described in further detail below.

2.  OSGold:  At all times relevant to this Indictment,
OSGold held itself out as an on-line "bank" which provided its
customers with Internet banking services that were purportedly
backed in part by gold bullion reserves.  OSGold was started in
or about March 2001 by DAVID COPELAND REED, the defendant, who
was also its President, and others who served as officers and
employees.  OSGold purported to operate in the following manner:

      a.  Customers opened accounts with OSGold by wire-

transferring money through intermediaries to bank accounts controlled by REED and others. Those funds were then converted into OSGold "units" that REED represented would be secured by gold. Each "unit" was represented to be based on the value of gold. The units were then deposited into the customer's OSGold account.

b.   Initially, OSGold customers deposited money into OSGold by opening an OSGold account on-line, and then wire-transferring money from existing bank accounts to their OSGold accounts through Osgold-approved "money-exchangers" or "money-makers" (explained in greater detail below); some time in 2001, ECommerce Exchange, described in greater detail below, became the only approved venue through which customers could transfer funds into their OSGold accounts.

c.   Once the currency conversion process described in ¶2.a. above was complete, customers could purportedly use their OSGold "units" to wire transfer money to locations around the world and to purchase items over the Internet. Customers also were able to track their OSGold account balances through the OSGold website, much as they

could track account balances with traditional bank
accounts.  A customer's OSGold account statement
reflected the customer's account value, in both
OSGold units and his or her local currency,
incorporating the fluctuating value of gold.

d.   Beginning in or about late 2001, OSGold also
provided its customers with debit cards that could
be used by customers at automated teller machines
("ATMs") throughout the world to withdraw funds
(in the form of cash) from their OSGold accounts.

3.   <u>OSOpps</u>:  At most times relevant to this
Indictment, OSOpps was marketed as an on-line "high-yield"
investment program linked to OSGold that promised to provide
investors with a guaranteed return of their principal as well as
high rates of return.  OSOpps, which was also controlled by DAVID
COPELAND REED, the defendant, operated in the following manner:

a.   REED began offering OSGold customers the
opportunity to invest in a "high yield investment
program" known as "OSOpps" beginning in or about
May 2001.

b.   According to the OSOpps website, OSOpps promised
its customers that they would receive a 30%
compounded return on their investments over the
course of three months or, if they invested for 12

3

months, a 45% rate of return.  In addition, OSOpps advertised that an investor's principal was fully guaranteed.

c.   An OSGold account was required in order for a prospective OSGold investor to invest in OSOpps. Investment returns from OSOpps purportedly were transferred into the investor's OSGold account and would appear on the customer/investor's OSGold account statement.  OSOpps investors could purportedly access on-line their OSGold accounts, and view the purported return they received from their OSOpps investments.

4.   ECommerce Exchange:  At most times relevant to this investigation, ECommerce Exchange ("ECX") was a money-exchanging business incorporated in North Carolina and operated by DAVID COPELAND REED, the defendant, and others, through an office in North Carolina.  A "money-exchanger" (also sometimes referred to as a "money-maker") is a business that provides conversion, transfer and/or exchange services for funds, in return for a certain percentage commission.  Initially, as noted above, an OSGold customer could deposit money into an OSGold account only through certain approved money-exchangers which were listed on the OSGold website.  In accepting the transfer of funds and forwarding such funds to Osgold/Osopps, the money-exchanger

would take a certain percentage of the transferred funds as a commission (typically approximately 2% of the funds involved). Beginning in or about the summer of 2001, REED and others began operating ECommerce Exchange.  Thereafter, ECommerce Exchange became the sole venue through which customers could transfer funds into their OSGold accounts.  At most times relevant to this Indictment, ECommerce Exchange had at least three bank accounts ("ECX Bank Accounts") at the following banks: Bank of America ("ECX Bank of America Account"); First Citizen's Bank ("ECX First Citizen's Account"); and BB&T ("ECX BB&T Account").  The funds which customers sent for deposit into OSGold, and which investors sent for OSOpps investments, were deposited (directly and indirectly) into these three accounts.  REED and another individual who was an officer along with REED of OSGold/ECommerce Exchange were signatories on all three accounts, and a third individual who was an employee of OSGold/ECommerce Exchange, was a signatory on two of these accounts.

     5.  <u>DAVID COPELAND REED</u>:  At all times relevant to this Indictment, DAVID COPELAND REED, the defendant, controlled OSGold, OSOpps, and ECommerce Exchange.  At certain times relevant to this Indictment, REED resided in North Carolina, although he traveled frequently to Mexico.  Beginning in or about June 2002, REED moved from North Carolina to in or around Cancun, Mexico.

6.   "Citibank Account Holder": At certain times relevant to this Indictment, an individual referred to herein as the "Citibank Account Holder" controlled at least two bank accounts at Citibank that were in the Citibank Account Holder's name ("Citibank Accounts"). The Citibank Account Holder was purportedly a Mexico-based business partner of DAVID COPELAND REED, the defendant. The Citibank Account Holder also controlled along with REED at least one bank account at Bital Bank in Mexico in the name of "Grupo Remago" which listed REED's then-home address in Mexico as its office address.

7.   CC-1: At certain times relevant to this Indictment, a co-conspirator not named herein ("CC-1") lived and worked in various countries in Europe, including the Netherlands and Latvia, and conducted business with DAVID COPELAND REED, the defendant. CC-1 was a controlling officer of at least two companies, "EC Gold" and "Eurogoldline", which were based in Europe and served as money-exchangers for OSGold in Europe. CC-1 controlled at least two bank accounts at Latvian banks in the name of "EC Gold" and at least two bank accounts at Latvian banks in the name of "Eurogoldline".

8.   CC-2: At certain times relevant to this Indictment, a co-conspirator not named herein ("CC-2") lived and worked in various countries in Europe, including the Netherlands and Latvia, and conducted business with DAVID COPELAND REED, the

defendant, and CC-1.   CC-2 controlled at least two personal bank accounts in the name of CC-2 at a bank in Latvia.

9.   <u>Employee #1</u>:   At certain times relevant to this Indictment, an individual referred to herein as "Employee #1" was an employee of OSGold, OSOpps, and ECommerce Exchange based in North Carolina who was responsible for computer programming. Employee #1 was an authorized signatory on the three ECX Bank Accounts listed above, and was listed as the "Secretary" of ECommerce Exchange and a "Partner" with DAVID COPELAND REED, the defendant, who was in turn listed as the "President" of ECommerce Exchange.

10.   <u>Employee #2</u>: At certain times relevant to this Indictment, an individual referred to herein as Employee #2 was an employee of OSGold and ECommerce Exchange based in North Carolina who was involved in customer service for OSGold. Employee #2 was an authorized signatory on the ECX First Citizen's Account and the ECX BB&T Account.

### Osgold/Osopps: The Scheme

11.   Between in or about March 2001, when OSGold began operating, and in or about June 2002, customers throughout the world opened approximately 66,000 accounts with OSGold and OSOpps, transferring a total of at least approximately $12.8 million to the three ECX Bank Accounts through ECommerce Exchange and other money-exchangers.   For the first few months of

7

operation, OSGold operated reliably and developed a reputation as a secure way to engage in Internet banking while OSOpps provided investors with online statements purporting to show promised rates of return on investments.

12.   DAVID COPELAND REED, the defendant, represented that the gold bullion reserves that OSGold claimed backed up the OSGold currency deposits were stored in an off-shore vault.

13.   DAVID COPELAND REED, the defendant, represented that the OSOpps investments could achieve the high returns advertised of 30% and 45% because the investors' money was traded in foreign exchange markets.

14.   In fact, DAVID COPELAND REED, the defendant, and his co-conspirators, caused the funds of customers/investors to be transferred (among other places) to bank accounts that he and his co-conspirators controlled in Latvia and Mexico, as set forth in greater detail below, see ¶¶ 15-17.

15.   In particular, DAVID COPELAND REED, the defendant, and his co-conspirators engaged in a money laundering scheme whereby the customers/investors' funds deposited into the ECX Bank Accounts were systematically withdrawn and distributed to and then distributed between and among numerous other bank accounts controlled by REED and/or his co-conspirators and associates, which bank accounts were located in the United States, Mexico, and Latvia, and elsewhere; other moneys were

withdrawn via cash withdrawals and/or distributed by checks made out to cash.  The funds were then funneled to the personal use of REED and his associates, including but not limited to the following: (1) for the purchase of airplane tickets for REED and his family to travel to Mexico; (2) for the purchase of vehicles for the use of REED and his associates; and (3) for personal businesses belonging to REED and his associates in Mexico, including, *inter alia*, a night club, a shopping mall, and a gymnasium in or around Cancun, Mexico.

16.   In substance and in part, DAVID COPELAND REED, the defendant, and his co-conspirators, caused the bulk of funds deposited <u>into</u> the ECX Accounts on behalf of customers/investors to be distributed via wire transfers to accounts in the names of various entities and individuals, as follows:

a.   <u>Citibank Account Holder</u>:

i.   As noted above, the Citibank Account Holder controlled at least two bank accounts at Citibank that were in the Citibank Account Holder's name, referred to herein as the Citibank Accounts.

ii.   REED and his co-conspirators caused at least approximately $1,026,507 to be transferred to the Citibank Accounts from the ECX BANK Accounts (controlled by REED and others), as

9

well as directly from money-exchangers on behalf of Osgold/Osopps customers and investors.

b.   DAVID COPELAND REED MEXICO ACCOUNT

   i.   REED controlled at least one account at the Bital Bank in Mexico in the name of the business "Grupo Remago," on which REED and the Citibank Account Holder are signatories ("DAVID COPELAND REED Mexico Account").  The address listed for that account matches the address of REED's home in or around Cancun, Mexico in or about 2002 and 2003 ("REED's Cancun Address").

   ii.  REED and his co-conspirators caused at least approximately $590,906 to be transferred to the DAVID COPELAND REED Mexico Account from the Citibank Accounts and the ECX Bank Accounts.

c.   DAVID COPELAND REED ASSOCIATES MEXICO ACCOUNTS

   i.   At least five additional accounts in Mexico are linked to REED and/or his co-conspirators and associates: (1) four business accounts bearing REED's Cancun Address which are in the names of four different businesses; and

(2) one account in the name of an individual
not named herein identified as another
business associate of REED's in Mexico
(collectively the "DAVID COPELAND REED
Associates Mexico Accounts").

ii.  REED and his co-conspirators caused at least
approximately $905,845 to be transferred to
the DAVID COPELAND REED Associates Mexico
Accounts from the ECX Bank Accounts; the
Citibank Accounts; and directly from money-
exchangers on behalf of OSGold/OSOpps
customers and investors.

d.  DAVID COPELAND REED LATVIA ACCOUNTS

i.  REED controlled accounts at banks in Latvia
including but not limited to the following:
(1) Aizkraukles Bank: two personal accounts
in his name and three business accounts in
the names of "Group Harbor Investments,
Inc.," "Thunderbirth Investing Corp.," and
"UMEX," respectively; (2) Lateko Bank: four
business accounts in the name of "UMEX"; and
(3) Parex Bank: one business account in the
name of "Thunderbirth Investing Corp"
(collectively the "DAVID COPELAND REED Latvia

Accounts").

ii.   REED and his co-conspirators caused at least
      approximately $389,985 to be transferred to
      the DAVID COPELAND REED Latvia Accounts from
      the Citibank Accounts; the ECX Bank Accounts;
      and directly from money-exchangers on behalf
      of OSGold/OSOpps investors.

e.   DAVID COPELAND REED ASSOCIATES LATVIA ACCOUNTS

   i.   At least four accounts at banks in Latvia are
        controlled by associates of REED, including
        the following: (1) Aizkraukles Bank: At least
        one account in the name of "EC Gold Ltd" and
        one account in the name of "Euro Gold Line",
        both companies controlled by CC-1, a Europe-
        based business associate and co-conspirator
        of REED's; (2) Parex Bank: At least one
        account in the name of "Eurogoldline", a
        company controlled by CC-1; and (3) Lateko
        Bank: At least one account controlled by CC-
        2, also a Europe-based business associate and
        co-conspirator of REED (collectively, the
        "DAVID COPELAND REED Associates Latvia
        Accounts").

   ii.   REED and his co-conspirators caused at least

approximately $6,164,688 to be transferred to the DAVID COPELAND REED Associates Latvia Accounts from the ECX Bank Accounts; the Citibank Accounts; and directly from money-exchangers on behalf of Osgold/Osopps customers and investors.

17.   Funds that were transferred from the ECX Bank Accounts to the various accounts as set forth above were then transferred out of these accounts via ATM cash withdrawals, checks written to cash, and transfers among and between these various accounts and other accounts controlled by DAVID COPELAND REED, the defendant, and his co-conspirators and associates in Mexico and Latvia.

18.   To further his fraudulent scheme and conceal the manner in which the fraudulently-obtained proceeds were being laundered, DAVID COPELAND REED, the defendant, manually altered OSOpps account statements in order to make it appear that customers were receiving the advertised investment returns. REED, or employees working at his direction, would download the account information for all of the OSOpps investors onto a spreadsheet, manually change the "amount" displayed in the accounts, and then load the information back on to the OSOpps website.  In this way, REED and his co-conspirators made it appear to OSOpps investors that their investments were increasing

13

at the rates advertised even though no such investments were actually being conducted. Despite REED's representations, neither REED nor any other employee or officer of OSOpps engaged in trading on the foreign exchange markets with the funds invested in OSOpps.

19. In or about March 2002, an investor in OSOpps attempted to withdraw approximately $10 million from the OSOpps investment program but DAVID COPELAND REED, the defendant, and his co-conspirators prevented the investor from withdrawing the funds as requested. Following complaints by this investor, other customers and investors attempted to withdraw their money from OSGold and OSOpps.

20. In response to inquiries, DAVID COPELAND REED, the defendant, and employees working at his direction, sent e-mail messages to customers/investors in OSGold and OSOpps over the course of the next few months designed to lull the customers and investors and further the scheme. These e-mails falsely indicated, among other things, that there were technical problems with regard to accessing OSGold/OSOpps monies, and that the problems were being addressed. REED drafted some of these emails; for some others, REED dictated the content, in substance and in part, to his employees.

21. In or about June 2002, OSGold and OSOpps ceased operations. DAVID COPELAND REED, the defendant, fled the United

14

States and relocated to Mexico.  Prior to leaving for Mexico, REED and his wife, a co-conspirator not named herein, withdrew large amounts of cash from the ECX Bank Accounts which they intended to secret (among other ways) in duffel bags and clothing in order to transport that cash to Mexico.  Millions of dollars of the investors' and depositors' money, including principal, was never returned.  No gold bullion reserves associated with OSGold have been located.

## Statutory Charges

22.  From in or about March 2001 up to and including in or about June 2002, in the Southern District of New York and elsewhere, DAVID COPELAND REED, the defendant, and others known and unknown to the Grand Jury, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 1956(a)(2)(A), and 1956(a)(2)(B)(i), of Title 18, United States Code.

23.  It was a part and an object of the conspiracy that DAVID COPELAND REED, the defendant, and others known and unknown to the Grand Jury, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, unlawfully, willfully

15

and knowingly would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, a wire fraud scheme, with the intent to promote the carrying on of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

24. It was further a part and an object of the conspiracy that DAVID COPELAND REED, the defendant, and others known and unknown to the Grand Jury, in an offense involving and affecting interstate and foreign commerce, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, unlawfully, willfully and knowingly would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit, a wire fraud scheme, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

25. It was further a part and an object of the conspiracy that DAVID COPELAND REED, the defendant, and others known and unknown to the Grand Jury, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully,

and knowingly would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds from a place in the United State to and through a place outside the United States and to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit, a wire fraud scheme, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

26. It was further a part and an object of the conspiracy that DAVID COPELAND REED, the defendant, and others known and unknown to the Grand Jury, in an offense involving and affecting interstate and foreign commerce, unlawfully, willfully, and knowingly would and did transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds from a place in the United State to and through a place outside the United States and to a place in the United States from and through a place outside the United States, knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, to wit, a wire fraud scheme, and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section

17

1956(a)(2)(B)(i).

## Means and Methods of the Conspiracy

27.  Among the means and methods DAVID COPELAND REED, the defendant, and others known and unknown to the Grand Jury, would and did use to carry out the unlawful objects of the conspiracy were the following:

28.  DAVID COPELAND REED, the defendant, and his co-conspirators fraudulently induced customers and investors to deposit millions of dollars into bank accounts controlled by REED and others in the United States including, but not limited to, the ECX Bank Accounts.

29.  DAVID COPELAND REED, the defendant, and his co-conspirators, caused the customers' and investors' funds to be transferred out of the ECX Bank Accounts in the following ways, *inter alia*:

      a.  Cash withdrawals from ATM machines in North Carolina and elsewhere by REED and his co-conspirators, a portion of which cash REED and his co-conspirators physically secreted and transported to Mexico from the United States;

      b.  Checks written to cash by REED and his co-conspirators and associates;

      c.  Wire transfers to accounts in the United States controlled by the Citibank Account Holder;

      d.  Wire transfers to accounts in Mexico and Latvia

controlled by REED;

e.   Wire transfers to accounts in Mexico and Latvia controlled by co-conspirators and associates of REED; and

f.   ATM cash withdrawals and checks written to cash from the accounts listed above, as well as wire transfers between and among accounts controlled by REED and his co-conspirators and associates in Mexico, Latvia, and elsewhere.

## Overt Acts

30.   In furtherance of said conspiracy and to effect the illegal objects thereof, DAVID COPELAND REED, the defendant, and others known and unknown to the Grand Jury, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about September 11, 2001, REED and his co-conspirators caused approximately $40,000 to be wire transferred from the ECX Bank of America Account, controlled by REED and others, to an account in the name of "Thunderbirth Investing Corporation" controlled by REED at a bank in Latvia ("Thunderbirth Account").  The wire transfer was routed through the Deutsche Bank Trust in New York, New York.

b.   Between on or about September 20, 2001 and on or

about January 1, 2002, REED and his co-conspirators caused approximately $38,000 to be withdrawn from the Thunderbirth Account via ATM withdrawals in Mexico, through an OSGold ATM debit card requested by REED.

c.   Between on or about March 13, 2002 and on or about April 23, 2002, REED and his co-conspirators caused approximately $170,000 to be wire transferred from the ECX BB&T Account, controlled by REED and others, to an account in the name of "Grupo Remago" controlled by REED and the Citibank Account Holder at a bank in Mexico.

d.   On or about April 25, 2002, REED and his co-conspirators caused approximately $20,400 to be wire transferred from an account at Northfork Bank in New York, New York to a money-exchanger on behalf of a customer/investor of OSGold/OSOpps.

e.   On or about May 13, 2002, REED and his co-conspirators caused approximately $21,000 to be wire transferred from an account at Northfork Bank in New York, New York to a money-exchanger on behalf of a customer/investor of OSGold/OSOpps.

f.   On or about May 29, 2002, REED and his co-conspirators caused approximately $57,250 to be wire transferred from an account at Northfork Bank

in New York, New York to a money-exchanger on
behalf of a customer/investor of OSGold/OSOpps.

g.  On or about November 25, 2002, REED and his co-
conspirators caused approximately $100,000 to be
wire transferred from one of the Citibank Accounts
to an account at a bank in Latvia in the name of
"Group Harbor Investments, Inc." controlled by
REED.

(Title 18, United States Code, Section 1956(h).)

## COUNT TWO

### (Money Laundering)

The Grand Jury further charges:

31.  The allegations contained in Paragraphs One
through Twenty-One and Twenty-Seven through Thirty of this
Indictment are repeated, realleged, and incorporated by reference
as if fully set forth herein.

32.  On or about September 11, 2001, in the Southern
District of New York and elsewhere, DAVID COPELAND REED, the
defendant, in an offense involving and affecting interstate and
foreign commerce, transported, transmitted, and transferred, and
attempted to transport, transmit, and transfer a monetary
instrument and funds from a place in the United State to and
through a place outside the United States and to a place in the
United States from and through a place outside the United States,

21

knowing that the monetary instrument and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, to wit, a wire fraud scheme, and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, to wit, REED caused approximately $40,000 to be wire transferred from the ECX Bank of America Account, controlled by REED and others, to the Thunderbirth Account controlled by REED at a bank in Latvia, which wire transfer was routed through the Deutsche Bank Trust in New York, New York.

(Title 18, United States Code, Sections 1956(a)(2)(B)(i) and 2.)

## COUNTS THREE THROUGH FIVE

(Wire Fraud)

The Grand Jury further charges:

33.   Paragraphs One through Twenty-One and Twenty-Seven through Thirty of this Indictment are repeated, realleged, and incorporated by reference as if fully set forth herein.

34.   On or about the dates set forth below, in the Southern District of New York and elsewhere, DAVID COPELAND REED, the defendant, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, to wit, a

fraudulent internet banking and investment scheme, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, signs, signals, and sounds for the purpose of executing such scheme and artifice, the following:

| COUNT | APPROXIMATE DATE | WIRE COMMUNICATION |
| --- | --- | --- |
| THREE | April 25, 2002 | Wire transfer of approximately $20,400 from a Northfork Bank, New York, New York branch, to a money-exchanger for an "OSGold" deposit |
| FOUR | May 13, 2002 | Wire transfer of approximately $21,000 from a Northfork Bank, New York, New York branch, to a money-exchanger for an "OSGold" deposit |
| FIVE | May 29, 2002 | Wire transfer of approximately $57,250 from a Northfork Bank, New York, New York branch, to a money-exchanger for an "OSGold" deposit |

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATION AS TO COUNTS ONE AND TWO

35.  Paragraphs One through Twenty-One and Twenty-Seven through Thirty of this Indictment are reincorporated and realleged as if set forth in full herein.

36.  As the result of committing one or more of the money laundering offenses in violation of Title 18, United States Code, Section 1956 and 2, alleged in Counts One and Two of this Indictment, DAVID COPELAND REED, the defendant, shall forfeit to the United States pursuant to 18 U.S.C. § 982, all property, real and personal, involved in the money laundering offenses and all property traceable to such property, including but not limited to the following:

23

a.   A sum of money equal to approximately $12.8 million in United States currency, in that such sum in aggregate is property which was involved in the money laundering offenses for which the defendant is liable or is traceable to such property.

### Substitute Assets Provision

b.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant —

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property.

(Title 18, United States Code, Section 982 and 1956.)

24

## FORFEITURE ALLEGATION AS TO COUNTS THREE THROUGH FIVE

37.   Paragraphs One through Twenty-One and Twenty-Seven through Thirty of this Indictment are reincorporated and realleged as if set forth in full herein.

38.   As the result of committing one or more of the wire fraud offenses in violation of Title 18, United States Code, Sections 1343 and 2, alleged in Counts Three through Five of this Indictment, DAVID COPELAND REED, the defendant, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses, including but not limited to the following:

a.   A sum of money equal to approximately $12.8 million in United States currency, representing the amount of proceeds obtained as a result of the offense for which the defendant is liable.

### Substitute Assets Provision

b.   If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant —

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

25

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty; it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property.

(Title 18, United States Code, Section 981; Title 28, United States Code, Section 2461; Title 18, United States Code, Sections 1343 & 2.)

FOREPERSON

MICHAEL J. GARCIA *MAA*
United States Attorney

26

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

### DAVID COPELAND REED,

**Defendant.**

## INDICTMENT

08 Cr. ___

Title 18 U.S.C. §§ 1956, 1343

MICHAEL J. GARCIA

United States Attorney.

**A TRUE BILL**

*Sherry Picchian*

Foreperson.